JON O. NEWMAN, Circuit Judge:
This appeal challenges significant rulings made jointly by a district judge and a bankruptcy judge in an effort to restructure the mechanism for distributing compensation to thousands of persons claiming asbestos-related injuries from products manufactured by the Johns-Manville Corporation. The rulings are presented for review on appeal from a judgment jointly entered on August 21, 1991, by the District Courts of the Eastern and Southern Districts of New York and the Bankruptcy Court of the Southern District of New York (Jack B. Weinstein, District Judge, and Burton R. Lifland, Chief Bankruptcy Judge) approving the settlement of a class action.
Some indication of the scope of the rulings is revealed by the fact that the principal opinion explaining them consumes 525 typescript pages — 201 printed pages of the Bankruptcy Reporter, supplemented by 68 pages of appendices. See In re Joint Eastern & Southern District Asbestos Litigation (“Asbestos Litigation II”), 129 B.R. 710 (E. & S.D.N.Y., Bankr.S.D.N.Y.1991). The dimensions of the controversy are indicated by the polar characterizations of the contending sides on this appeal. For the principal appellants, the proceedings giving rise to the challenged rulings are “unique in jurisprudential history, if not bizarre,” Joint Brief for Appellants at 3, “frightening,” id. at 101, and “grossly” beyond “the bounds of judicial power,” id. The appellees consider the rulings to be simply the valid settlement of a class action within the jurisdiction of the District Court, accomplished to enhance the fairness of the ultimate distribution of compensation to asbestos victims.
We conclude that the judgment approving the settlement must be vacated because, to the extent that the judgment rests on diversity jurisdiction, the use of a mandatory non-opt-out class action without proper subclasses violates the requirements of Rule 23 of the Federal Rules of Civil Procedure, and, to the extent that the judgment rests on bankruptcy jurisdiction, it represents an impermissible modification of a confirmed and substantially consummated plan of reorganization in violation of section 1127(b) of the Bankruptcy Code.
BACKGROUND
A. The Manville Reorganization. The current controversy arises in the aftermath of the confirmation of a plan of reorganization of the Johns-Manville Corporation (“the Debtor”) the world’s largest manufacturer of asbestos. Facing claims from current and future victims of asbestos-related deaths and injuries estimated to total $2 billion, the Debtor filed a voluntary petition in bankruptcy under Chapter 11 on August 26, 1982. The reorganization proceeding involved both “present claimants,” i.e., persons who, prior to the petition date, had been exposed to Manville asbestos and had developed an asbestos-related disease, and “future claimants,” i.e., persons who had been exposed to Manville asbestos pri- or to the petition date but had not shown any signs of disease at that time. The Bankruptcy Court appointed a legal guardian to represent the interests of the future claimants.
After four years of negotiation, a Second Amended Plan of Reorganization (“the Plan”) was presented to the Bankruptcy Court, see Manville Corp. v. Equity Security Holders Committee (In re Johns-Manville Corp.), 66 B.R. 517, 518-33 (Bankr.S.D.N.Y.1986), and confirmed in 1986, In re Johns-Manville Corp., 68 B.R. 618 (Bankr.S.D.N.Y.1986). The cornerstone of the Plan was the Manville Personal Injury Settlement Trust (“the Trust” or “the PI Trust”), a mechanism designed to satisfy the claims of all asbestos health claimants, both present and future. The Trust was to be funded from several sources: the proceeds of the Debtor’s settlements with its insurers; certain cash, receivables, and stock of the reorganized Manville Corporation (“Manville”); long term notes; and the right to receive up to 20 percent of Manville’s yearly profits for as long as it might take to satisfy all asbestos disease claims.
*726 As a condition precedent to confirmation of the Plan, the Bankruptcy Court issued an injunction channeling to the Trust all asbestos-related personal injury claims against the Debtor (“the Injunction”). The Injunction specifies that asbestos health claimants may proceed only against the Trust to satisfy their claims against the Debtor and may not sue Manville, its related operating entities, or its insurers. The Injunction applies to all health claimants, both present and future, regardless of whether they technically have dischargeable “claims” under the Code. Those with present claims unquestionably have dis-chargeable “claims” within the meaning of 11 U.S.C. § 101(4) (1988) and hold what the Plan categorizes as “AH Claims”; holders of AH Claims are Class-4 unsecured creditors under the Plan. If future claimants are ultimately determined to hold “claims” within the meaning of section 101(4), they too will be Class-4 unsecured creditors. If it is determined that they do not hold “claims,” they will then fall within a category denominated by the Plan as “Other Asbestos Obligations.” Whether or not the future claimants have creditor status under the Plan, they are nevertheless treated identically to the present claimants, at least to the extent of being obliged to look to the Trust as the sole source of compensation. All health claimants are required to attempt settlement with the Trust. If a settlement cannot be reached, the claimant may elect mediation, binding arbitration, or traditional tort litigation in state or federal court, including trial by jury. The claimant may collect from the Trust the full amount of whatever compensatory damages are awarded. The only restriction on recovery is that punitive damages are prohibited.
Exhibit C to the Plan is the Manville Personal Injury Settlement Trust Agreement (“the Trust Agreement” or “the PI Trust Agreement”). The Trust Agreement contains Annex B, establishing Claims Resolution Procedures. A significant provision of Annex B, pertinent to one of the major issues raised on this appeal, specifies that claims will be processed “in order of initial filing, whether in a court or with the MSV [the Manville Settlement Vehicle, the mechanism established to attempt settlement of individual claims], whichever is earlier, on a first-in-first-out basis except that claims which have been settled with all defendants except defendants which are petitioners in these bankruptcy proceedings may be negotiated separately on a first-in-first-out basis with representatives of the MSV.” Trust Agreement, Annex B, § I.A.2.
Challenges to the confirmation of the Plan were rejected by this Court, at least those challenges that the appellants had standing to bring. See Kane v. Johns-Manville Corp., 843 F.2d 636 (2d Cir.1988).
Pursuant to the Plan, the Trust received $909 million in cash, two bonds with an aggregate value of $1.8 billion, 24 million shares of Manville common stock, and 7.2 million shares of Manville convertible preferred stock, aggregating 80 percent of the stock of the reorganized Manville. See In re Joint Eastern & Southern District Asbestos Litigation (“Asbestos Litigation I”), 120 B.R. 648, 652 (E. & S.D.N.Y., Bankr.S.D.N.Y.1990). Despite this funding, it soon became apparent that the liquidation of the claims of thousands of asbestos victims was substantially depleting the Trust’s cash. By March 30,1990, the Trust had received more than 150,000 claims, 50 percent above the highest number estimated when the Plan was approved. Id. The Trust settled 22,386 of those claims at an average liquidated value of $42,000. Id. By the spring of 1990, “the Trust was effectively out of money to pay its current and short term obligations.” Id.
B. The Evolution of the Trust Restructuring. Inevitably, the financial plight of the Trust came to the attention of trial judges in the Eastern and Southern Districts of New York, who were struggling to cope with the mounting flood of asbestos cases. On June 1, 1990, Judge Weinstein of the Eastern District and Justice Freedman of the New York Supreme Court, who had been jointly endeavoring to settle a number of federal and state court asbestos cases pertaining to the Brooklyn Navy *727 Yard, issued a joint order sua sponte.[1] The order did not require anything, but contained several suggestions. One paragraph noted both the financial plight of the Trust and a suggestion that Manville should advance between 200 and 300 million dollars to the Trust. Another paragraph noted a need to restrict payments and urged that the Plan should be amended to permit inquiry into attorney’s fees and that the Trust should consider amending its “Payment Program” to provide for installment payments and to reject the FIFO order of payments, with payments scheduled instead based on fixed criteria such as disease, age, and availability of funds.
On July 9, 1991, Judge Weinstein issued a further order, sua sponte.[2] This Order contained several provisions. First, under the heading “Directions to Leon Silverman, Advisor to Bankruptcy Judge,” it pointed out the need to restructure the Trust and noted that Judge Lifland had given Silver-man until August 6 “to arrange the restructuring outlined.” Second, explicitly exercising authority as a district judge of the Southern District pursuant to an assignment by the Chief Judge of the Circuit, dated January 23, 1990, Judge Weinstein issued a partial stay of payments by the Trust, staying until August 6, 1990, payments of judgments, settlements, and legal fees. Third, the Order stated that the circumstances “appear to warrant a non-opt-out class under Rule 23(b)(1)(B),” which would “provide substantial benefit to those injured, the economy and the courts.” Judge Weinstein stated that he would not “today mandate such a step,” but urged all those involved to make recommendations for “a Rule 23(b)(1)(B) global settlement” and warned, “Failure to do so will leave this Court no alternative but to consider other available options.”
On July 20, 1990, Judge Weinstein was granted supervisory responsibility over the Plan, pursuant to a designation by the Circuit Chief Judge and an assignment order by the Chief Judge of the Southern District. See Asbestos Litigation II, 129 B.R. at 762. In effect, what had occurred was a partial removal of the Chapter 11 proceeding from the Bankruptcy Court to the District Court under 28 U.S.C. § 157(d) (1988) (district court may, on its own motion, withdraw, in whole or in part, any proceeding referred under section 157 to bankruptcy judge).
On September 18, 1990, Judge Weinstein appointed Marvin E. Frankel, Esq., as a special master to hold hearings and to report on two questions: (1) whether the financial assets of the Trust were so limited as to create a substantial risk that payments for present and future claimants would be in jeopardy, and (2) whether there was a substantial probability that payment of damage awards would exhaust the Trust’s available and projected assets. See Asbestos Litigation II, 129 B.R. at 764-65. This appointment was made in response to a motion by the Trust for a determination that its assets constituted a limited fund within the meaning of Rule 23(b)(1)(B). See id. at 764. The Special Master’s report, submitted November 3, 1990, concluded that the Trust was “deeply insolvent.” Asbestos Litigation I, App. C, 120 B.R. at 668. The Special Master estimated that the Trust’s assets had a value between $2.1 and $2.7 billion, that current and future claims were estimated at $6.5 billion, and that the Trust currently lacked the cash to pay the then liquidated total of $448.5 million in claims. Id. at 667-68.
There then ensued a negotiation among lawyers representing present claimants, future claimants, the Trust, asbestos manufacturers who were co-defendants of the Trust in pending lawsuits, and Manville. The negotiations resulted in a proposal, *728 agreed to by lawyers representing many of the interested parties but not all of the claimants, for paying present and future claimants. The proposal called for a revised Trust Distribution Process, which we outline below. With the proposed revision widely though not universally agreed to, the restructuring was accomplished by means of the filing and rapid settlement of a class action.
C. The Class Action. On Nov. 19, 1990, five plaintiffs with claims against the Trust for death or injury caused by exposure to asbestos filed a class action complaint on behalf of all beneficiaries of the Trust against the trustees of the Trust and simultaneously filed a proposed Stipulation of Settlement of the class action. The judgment approving the settlement is the subject of the pending appeal. The complaint, styled Findley [et al.Jv. Blinken[et al.J was captioned as filed both in In re Joint Eastern and Southern District Asbestos Litigation, pending in the Eastern and Southern Districts, and in In re Johns-Manville Corp., the Chapter 11 proceeding pending in the Bankruptcy Court of the Southern District. The complaint was filed on behalf of the named plaintiffs and “all others similarly situated as Beneficiaries of the Trust____ Each Class member has or will have a claim either for death or personal injury caused by exposure to asbestos, or a claim for warranty, guarantee, indemnification or contribution arising from an obligation of the Trust for the payment of a Trust death or personal injury claim.” Complaint, ¶ 9.
The complaint invoked both diversity jurisdiction and bankruptcy jurisdiction. Diversity jurisdiction was based on allegations that diversity of citizenship existed between the named plaintiffs, on the one hand, and the defendant Trustees, on the other, and the matter in controversy exceeded $50,000. See 28 U.S.C. § 1332 (1988 & Supp. II 1990). Bankruptcy jurisdiction was based on the allegation that the action was “related” to the Manville reorganization proceeding, over which the Court had retained jurisdiction. Complaint, If 5.
The complaint alleged a single count “Seeking to Establish An Equitable Distribution of the Trust Res.” Id. at 7. It alleged that the Trust is required to pay all claims in full shortly after claims are liquidated, that the assets of the Trust are insufficient to permit such payment without jeopardizing the payment of the claims of other beneficiaries, that “[ejquitable principles of trust law and other applicable law require that the Court determine an equitable allocation of the Trust res among its Beneficiaries and a restructuring of the Trust’s procedures for payment to its Beneficiaries,” id. ¶ 21, that 70,000 actions are currently pending against the Trust, id. If 22, and that continued prosecution of these actions will defeat the purposes of the Trust by depleting the Trust res, id. As relief, the complaint sought a judgment determining an equitable allocation of the Trust res among all beneficiaries, determining the “relative rights and priorities” of all beneficiaries, determining an equitable, efficient, and inexpensive method for fixing the amount each beneficiary is entitled to receive and for distribution of Trust assets, and “enjoining permanently all pending and future proceedings by Beneficiaries against the Trust in all state and federal courts except in accordance with the procedures determined hereby.” Id. at 9.
On the day the complaint was filed, District Judge Weinstein and Bankruptcy Judge Lifland (hereafter “the Trial Courts”) jointly entered orders to show cause why orders should not be entered (a) conditionally certifying the class, (b) appointing a legal representative for beneficiaries of the Trust who have not yet asserted asbestos claims, and (c) staying all proceedings against the Trust pending determination of the class action. A hearing was scheduled for November 23, four days after the complaint was filed (and the day after Thanksgiving). On November 23, after hearing oral argument, the Trial Courts entered orders (1) conditionally certifying the class and appointing representative counsel, Asbestos Litigation I, App. D, 120 B.R. at 681, (2) setting fairness hearings in four cities and approving a form of notice, id., App. E, 120 B.R. at 683, (3) staying *729 payments by the Trust, id, App. F, 120 B.R. at 687, (4) staying proceedings against the Trust, id, App. G, 120 B.R. at 688, (5) making exceptions to the order staying proceedings, id, App. H, 120 B.R. at 689, and (6) appointing counsel as representatives for defendants, other than the Trust, in pending asbestos litigation, id, App. I, 120 B.R. at 691.
Copies of the foregoing orders were mailed to counsel for each known claimant and each co-defendant and to approximately 1,500 pro se claimants. Asbestos Litigation II, 129 B.R. at 774. Copies were also distributed to all courts in which the Trust was a party to litigation, and to various other interested persons. Id. Notice of the proposed settlement was published in 11 major newspapers. Id. at 775. Hearings on the fairness of the proposed settlement were conducted in four cities. The hearings, conducted over eight days, received evidence from proponents of the settlement and objectors. Thirty-seven witnesses and attorneys were heard.
On February 13, 1991, the Trial Courts issued an Order and Partial Judgment, certifying a mandatory non-opt-out class under Rule 23(b)(1)(B). Id. at 776. At that time a motion by a member of the class to opt out was denied.
On June 27, 1991,[3] the Trial Courts filed an Amended Memorandum, Order, and Final Judgment, id. at 710-911, after affording the parties an opportunity to comment on an earlier version, see id. at 734. The judgment[4] (1) approves the settlement, (2) makes permanent the prior stay of proceedings against the Trust, and (3) reaffirms the prior injunction, issued in the Chapter 11 proceeding, restricting suits against the Manville Corporation. Id. at 911.
D. The Settlement. The settlement, set out in Asbestos Litigation I, App. C, 120 B.R. at 668 (hereafter “Settlement” with page citations to Asbestos Litigation I, 120 B.R. at 669), contains numerous provisions. First, it specifies that it is binding on the class that consists of all beneficiaries of the Trust who now have or in the future may have (a) any unliquidated claims for death or injury resulting from exposure to Manville asbestos, (b) any warranty, guarantee, indemnification, or contribution claims against the Trust arising from exposure to asbestos by any class member, and (c) settlements or judgments arising from any of the foregoing claims. Settlement H 2, 120 B.R. at 669. Trust beneficiaries include those with death or personal injury claims arising from exposure to Manville asbestos prior to the confirmation date. See Plan, Exhibit A (definitions of “Beneficiary,” “Trust Claim,” “Trust Liabilities,” and “AH Claims”).
Second, and a source of major dispute on this appeal, the Settlement establishes a Trust Distribution Process (“TDP”), and specifies that Trust payments will be made only in compliance with the TDP. Settlement 11 8,120 B.R. at 669. The objective of the TDP is stated to be “to treat all claimants alike by paying all claimants an equal percentage of their claims’ values over time.” Id., Exhibit A, 11 A, 120 B.R. at 670. The TDP divides all asbestos disease claims into two levels. The most seriously injured claimants are placed in Level One; these include all claims for asbestos-related cancers, all claims “of a sufficient severity to justify treatment with cancer cases,” and claims for death substantially caused by asbestos-related disease. Id. at 670-71. All other health claimants are placed in Level Two.
The TDP makes three distinctions in the payment of Level One and Level Two claims:
—First, the TDP establishes maximum payments for various disease conditions, and sets the máximums for Level One claims substantially higher than for Level *730 Two claims. For Level One claims, the máximums are $350,000 for mesothelioma, $300,000 for lung cancer occurring in nonsmokers and for non-malignant diseases, $150,000 for lung cancer occurring in smokers, and $75,000 for all cancers other than mesothelioma or lung cancer. For Level Two claims, the máximums are $75,-000 for asbestosis and $30,000 for pleural disease. Id. at 680. Exceptions to the máximums may be made for “truly extraordinary situations.” Id. at 680.
—Second, the TDP provides for faster payment for Level One claims. Level One claims will begin to receive payments in the first two years of the TDP. Level Two claims will begin to receive payments in the third year of the TDP. Claimants in Level One will initially be paid up to 45 percent of their claims (depending on the price at which the Trust sells its Manville stock) and then stop receiving payment until all other claimants have received 45 percent of their claims; thereafter, payments will be made to all claimants on a pro rata basis, as funds are available, until the full liquidated value of all claims has been paid. Id. at 670.
—Third, the TDP creates a risk that Level Two claimants will receive a smaller percentage of their claims than Level One claimants. This risk arises from a combination of the delayed payment schedule for Level Two claims and the possibility that the present and future assets available to pay claims will be insufficient to pay all claims in full. The Trial Courts estimated that the shares of Manville owned by the Trust would have to reach a price of $24-$25 per share before the Trust could raise enough money to pay Level Two claimants the same 45 percent share of awards that will be paid to Level One claimants. In the period prior to the Settlement, Manville shares traded between $4 and $5 per share. Asbestos Litigation II, 129 B.R. at 862.
The TDP also makes a distinction in the method of adjudication of health claims in an effort to divert claims out of the tort system (i.e., jury trial). The TDP establishes two payment pools. Claimants who accept liquidated values offered by the Trust or determined in binding or non-binding arbitration will be paid from Pool A. Claimants who opt for jury trials will be paid their judgment from Pool A only to the extent of the upper limit of the disease category established by the Trust or by non-binding arbitration, or such higher amount as may have been offered by the Trust or awarded through arbitration; the excess amount of any judgment will be collectable only from Pool B. 120 B.R. at 673-74. Payments can be made from Pool B in any one year only after all Pool A claims available for payment in that year have been fully paid, id. at 674, an outcome that the appellants contend is impossible.
Third, to facilitate the restructuring of the Trust, the Settlement includes a Master Agreement between the Trust and Man-ville, requiring Manville to supply additional financing beyond the 20 percent profit-sharing called for by the Plan. Manville is to pay the Trust $280 million during the first four years and become obligated to pay a special dividend, depending on profitability, that will provide the Trust with sums up to an additional $240 million through the seventh year. See Asbestos Litigation II, 129 B.R. at 770. Refinancing of the Trust’s bonds will also occur. Id. at 771.
Fourth, the Settlement includes a provision limiting the fees of lawyers for health claimants to the lesser of their contracted fee or 25 percent of any recovery. Settlement, 120 B.R. at 677.
Fifth, Section H of the Settlement includes a complicated provision purporting to reduce the Trust’s litigating expenses by preventing all Trust beneficiaries from litigating their claims in state or federal courts. Id. at 676-77. Section H provides for an injunction ordering all Trust beneficiaries, including health claimants and asbestos manufacturers who are co-defendants of the Debtor in pending state and federal asbestos lawsuits, to dismiss, without prejudice, all pending cases, to be barred from filing future cases against Manville or the Trust, and to pursue their claims against the Trust only to the extent permitted by the Settlement. Section H *731 also provides that in any litigation between beneficiaries of the Trust (health claimants and co-defendant manufacturers) all beneficiaries are enjoined from asserting or introducing evidence that the Trust is a joint and/or several tortfeasor, that the Trust is responsible for any injury, or that the Trust would have been responsible for any injury if it had been made a party. In the view of the co-defendant manufacturers, these prohibitions ban the introduction of Manville-related causation evidence at trial, establish national rules of joint and several liability and pro tanto (i.e., dollar for dollar) setoff for the Manville liability share, and ban impleader of the Trust. Such provisions, the co-defendants contend, trench on state law provisions and shift hundreds of millions of dollars of Manville asbestos liability from the Trust to the co-defendants.
In approving the Settlement, the Trial Courts recognized that Section H “presents substantial risk of altering constitutional and state law rights of certain parties if read literally and expansively.” Asbestos Litigation II, 129 B.R. at 871 (emphasis added). The Trial Courts suggested that they might be entitled to impose a uniform national rule governing the contribution and related rights of co-defendants “[djrawing on the courts’ continuing bankruptcy jurisdiction.” Id. at 875-76. However, they refrained from attempting to invoke bankruptcy court jurisdiction to impose uniform tort rules, noting that the matter before them was “a class action, based primarily on diversity jurisdiction, rather than a pure bankruptcy proceeding.” Id. at 877. Instead, the Trial Courts sought to relax the rigor of Section H by “interpret[ing]” it, id. at 894, stating that “[m]uch of section H is precatory,” id. at 895.
The “interpretation” permits the states “to exercise their evidence and substantive law policies to regulate the relationship between plaintiffs and codefendants so long as the method of recovery from the Trust is not affected and the Trust is not required to participate in any way in any litigation.” Id. at 894. More specifically, states are authorized to “apply state policy and law to control set-off and contribution in contravention of the terms of section H,” id. at 899, and state and federal courts are authorized to “admit or exclude evidence in contravention of the terms of section H,” id. at 904. The standard of Section H is not abandoned, however; rather, it is to govern state and federal court litigation “except where it violates either a fundamental public policy of New York or any other state.” Id. at 884.
E. The Interim Rule 706 Order. While the Settlement was sub judice, Judge Weinstein filed an order, entered April 22, 1991, that is the subject of a pending mandamus petition and a purported interlocutory appeal. Review of the April 22 order is also sought on the appeal from the final judgment approving the class action settlement. The April 22 order arose from the following circumstances. On December 7, 1990, in anticipation of fairness hearings on the proposed settlement of the class action, Judge Weinstein appointed Professor Margaret A. Berger, Associate Dean of the Brooklyn Law School, as an expert to advise the Court pursuant to Rule 706 of the Federal Rules of Evidence, 122 B.R. 6. Among the tasks assigned to Dean Berger were reporting to the Court on the feasibility of providing accurate estimates of future claims upon the Trust and on procedures for collecting information and establishing a data base with respect to future claimants, aiding the Court in selecting a panel of knowledgeable and neutral experts, and supervising the work of the panel. Judge Weinstein contemplated that a major issue in the administration of the Trust, pursuant to the proposed settlement, would be the proper allocation of the proceeds of the sale of Trust assets, such as Manville stock, between payment of current claims and maintenance of a reserve for future claims. Critical to that allocation would be estimates of the number of future claimants.
Dean Berger testified at the fairness hearing on January 22, 1991, commenting on the difficulty of estimating future claims but expressing the view that reasonably accurate estimates could be made. On April 1, 1991, Dean Berger filed with the *732 Trial Courts an “Interim Rule 706 Report.” She recommended that, pursuant to Rule 706, Dr. Kenneth G. Mantón, Research Professor of Demographic Studies at Duke University, be appointed as an expert to begin preparing projections of future asbestos claimants and that Dr. Joel E. Cohen of Rockefeller University be appointed as a consultant to oversee Prof. Manton's work. She also indicated that it might be appropriate thereafter to appoint a panel of experts to advise Profs. Mantón and Cohen.
Judge Weinstein issued an order to all parties to show cause why the Interim Rule 706 Report should not be approved. The Report was opposed by the class representatives on the grounds that the Report exceeded the scope of Dean Berger’s role in connection with the fairness hearing and exceeded the bounds of Rule 706 and conflicted with the fiduciary duties of the Trustees by authorizing a panel of experts charged with the duty of developing estimates concerning future claimants. After hearing the parties’ objections, Judge Weinstein entered the April 22 order, approving the Interim Rule 706 Report and directing the Trust to make $60,000 available for studies to be undertaken at Dean Berger’s direction. The order is challenged in a mandamus petition and an appeal by the class representatives of the health claimants and by the Trustees and defended by the Legal Representative of Future Claimants.
DISCUSSION
The pending appeal presents a broad array of challenges to the Settlement brought primarily by two groups of appellants — health claimants who objected to the Settlement and co-defendant manufacturers of asbestos.[5] The objecting health claimants contend essentially (1) that the Trial Courts acted beyond judicial authority in developing and engineering the adoption of a legislative solution to the financial difficulties of the Trust, (2) that the Trial Courts exceeded their subject matter jurisdiction, (3) that the Trial Courts lacked personal jurisdiction over absent asbestos disease claimants, (4) that the Settlement violates the Bankruptcy Code in that it modifies a confirmed and substantially consummated plan of reorganization in violation of 11 U.S.C. § 1127(b) (1988), (5) that, even if the Trial Courts have authority to reopen the reorganization and modify the Plan, the Settlement violates specific limitations of the Code, notably the requirement that members of each class receive the “same treatment,” id. § 1123(a)(4), (6) that the Settlement denies health claimants their rights to procedural due process and violates the requirements of Fed.R.Civ.P. 23 because of defects in the class notice, lack of an adequate opportunity to be heard, lack of appropriate subclasses, and lack of an opportunity to opt out of the class, (7) that the Settlement is unfair, (8) that the orders respecting state court actions violate the Anti-Injunction Act, 28 U.S.C. § 2283 (1988), and exceed the Trial Courts’ authority under the All-Writs Act, 28 U.S.C. § 1651 (1988), and (9) that the Trial Courts erred in denying one law firm’s fee application. The co-defendant manufacturers advance essentially two contentions. First, they urge that the class definition improperly groups them with the health claimants in disregard of a fundamental adversity of interests between the two groups. Second, they urge that Section H of the Settlement unlawfully impairs their state law rights and that the Trial Courts’ opinion confirming the Settlement is fatally imprecise to the extent that it endeavors to lessen the rigor of Section H through “interpretation.”
I. JUDICIAL AUTHORITY
Though the jurisdictional challenges are substantial and merit careful attention, we first consider the even more basic contention that the entire course of events that culminated in the Settlement of the class action represent action beyond the scope of *733 legitimate judicial authority. Specifically, the objecting health claimants contend that Judge Weinstein acted in a legislative capacity in initiating the restructuring of the Trust and shaping the contours of the Settlement.
Judge Weinstein was duly designated to act as a district judge of the Southern District by designation of the Chief Judge of this Circuit on January 23,1990. In that capacity and in his normal capacity as a district judge of the Eastern District, he was exercising entirely legitimate authority in supervising the trial preparation of the group of asbestos cases collectively identified as In re Joint Eastern and Southern District Asbestos Litigation. As a district judge with responsibilities for cases seeking recovery from the Manville Trust, he was surely entitled to be concerned with the ability of that Trust to fulfill its expectations. And, having become aware of the developing economic plight of the Trust, he was entitled to act within the framework of the Judicial Branch to initiate remedial steps.
At that point, however, Judge Weinstein had no bankruptcy court authority, and the Trust was an integral component of a then pending bankruptcy reorganization. We believe the more prudent course would have been to alert the Bankruptcy Judge then supervising the Manville reorganization as to the adverse effects the Trust’s financial condition was having upon the resolution of pending asbestos cases and also to alert the Chief Judge of the Circuit and the Chief Judge of the Southern District so that those officials could consider the exercise of their authority to effect any necessary special designations. Instead, Judge Weinstein issued sua sponte the orders of June 1,1990, and July 9, 1990, 1990 WL 115761. We think these actions were ill-advised, as they concerned a reorganization proceeding over which Judge Weinstein then had no judicial authority.
On July 20, 1990, 1990 WL 115785, however, Judge Weinstein’s authority to take judicial action with respect to the Man-ville reorganization was fully supplied by a grant of supervisory responsibility over the Plan, pursuant to a designation by the Circuit Chief Judge and an assignment order by the Chief Judge of the Southern District. See Asbestos Litigation II, 129 B.R. at 762. Whether or not his actions from that point on were in any respect erroneous, they were fully within his judicial authority. We reject the contention that Judge Weinstein assumed a legislative role in proposing steps to restructure the Trust and working rather forcefully with the parties to accomplish the restructuring. A judge with responsibilities for a lawsuit is not a bystander. Nor is the judge relegated to the role of umpire, awaiting the submission of precisely framed disputes by the parties. Especially in the course of a complex and continuing proceeding such as a bankruptcy reorganization, a judge has an entirely legitimate judicial role in suggesting constructive solutions and assisting the parties in achieving them.
Of course, there are limits to the exercise of that role. There is a line to be observed between suggesting the resolution of a dispute and insisting upon it. And all who have exercised judicial authority are aware that, unless a judge acts with caution and sensitivity, there is a risk that what the judge tenders as a suggestion will be perceived as a command. In this proceeding, we are satisfied that, once duly authorized to act with respect to the Manville reorganization, Judge Weinstein did not exceed judicial authority. And whatever infirmity may have attended the issuance of the orders of June 1 and July 9, issued before the July 20 designations, provides no basis for complaint. To a large extent, those orders were advisory only. To whatever extent the July 9 order went beyond advice, it was effectively ratified and validated by the grant of authority conveyed on July 20.
II. THE HYBRID NATURE OF THE LAWSUIT
The Trial Courts purported to be exercising both bankruptcy court jurisdiction under 28 U.S.C. § 1334 and diversity jurisdiction under 28 U.S.C. § 1332. Asbestos Litigation II, 129 B.R. at 795. Their elaborate opinion does not relate specific rulings *734 to one or the other source of jurisdiction. They observe only that the matter before them is “based primarily on diversity jurisdiction, rather than a pure bankruptcy proceeding.” Id. at 877. Before reviewing the challenges to the exercise of either basis of jurisdiction, we pause to dispel some confusion, reflected in some of the parties’ arguments, as to the respective spheres of authority of a diversity court and a bankruptcy court in this unusual hybrid action.
Though the appellants challenge the exercise of both diversity and bankruptcy jurisdiction, they appear, at times, to argue that only bankruptcy jurisdiction is available to deal in any way with the Manville Trust because it is an integral component of a confirmed plan of reorganization. If that is their contention, it is not correct. The Bankruptcy Court in the Chapter 11 proceeding had authority to make changes in the state law rights of creditors and to replace those rights with a new set of state law rights. Just as a reorganized corporation is subject to state law, so also is a trust that emerges from a plan of reorganization. Of course, state law might not, as a substantive matter, be able to alter any of the state law rights enjoyed by those dealing with the reorganized corporation, or in this case, with the Trust, either because state law does not authorize the requested relief or because its attempt to do so encounters constitutional obstacles. Some changes in rights, notably the rights of creditors, can be involuntarily altered only in the exercise of bankruptcy authority. But if a lawsuit is filed asserting a valid state law cause of action against an entity that has emerged from a reorganization plan, that suit may be settled, and any state law rights may be voluntarily modified so long as the settlement is within the subject matter jurisdiction of the court approving it and the settlement is accomplished in observance of all applicable procedural requirements. That is what the appellees contend has occurred in this case — the filing of a state law cause of action to restructure the Trust in a diversity court with subject matter jurisdiction and the settlement of that suit in observance of the procedural requirements of Rule 23. We therefore turn first to the objections to the exercise of the Trial Courts’ diversity jurisdiction and then proceed, in the event deficiencies are encountered, to consider whether the changes wrought by the Settlement may be accomplished in the exercise of bankruptcy jurisdiction.
III. EXERCISE OF DIVERSITY JURISDICTION
A. Diversity subject matter jurisdiction
Appellants contend that not all of the members of the plaintiff class satisfy the $50,000 jurisdictional amount requirement, which all class members must meet. See Zahn v. International Paper Co., 414 U.S. 291, 301, 94 S.Ct. 505, 512, 38 L.Ed.2d 511 (1973). They point out that settlements of asbestos disease claimants have averaged approximately $43,000, and that Level 2 claimants with pleural disease claims are now subjected (as a result of the Settlement) to a $30,000 cap. Neither circumstance defeats diversity jurisdiction. The good faith claim of each plaintiff controls, see St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 288-89, 58 S.Ct. 586, 590-91, 82 L.Ed. 845 (1938), and we have no basis for disturbing the Trial Courts’ conclusion that no member of the plaintiff class failed to satisfy the jurisdictional amount. See Asbestos Litigation II, 129 B.R. at 793-94.
B. Diversity personal jurisdiction
Appellants contend that the Trial Courts lacked personal jurisdiction over absent class members. They rely on Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985), in which the Supreme Court outlined the requirements for assertion of personal jurisdiction over absent members of a plaintiff class in an action seeking money damages. Appellees respond that the requirements of Shutts are limited to claims “wholly or predominantly for money judgments,” id. at 811 n. 3, 105 S.Ct. at 2974 n. 3, and that the due process standards for this suit *735 seeking equitable relief are those set forth in Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940).
The pending suit is not precisely analogous to either Shutts or Hansberry. It does not seek money damages, yet the “equitable relief” that it seeks in the restructuring of the Trust will have a profound effect upon the amount of damages that each member of the plaintiff class will be entitled to receive. If the members of the plaintiff class were not all beneficiaries of the Trust, we would think that the applicable standards for personal jurisdiction would be drawn more from Shutts than from Hansberry, though even the standards of Shutts, to the extent applicable to this case, may well have been satisfied. However, we agree with the appellees and with the Trial Courts that in rem and quasi in rem jurisdiction is available. See Asbestos Litigation II, 129 B.R. at 798-800. The Trial Courts are fully entitled to exercise jurisdiction over the beneficiaries of a trust created in New York, pursuant to the authority of a Southern District bankruptcy court. See Shaffer v. Heitner, 433 U.S. 186, 207-08 & n. 30, 97 S.Ct. 2569, 2581-82 & n. 30, 53 L.Ed.2d 683 (1977); Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950). Whether the changes in the rights of those beneficiaries can be accomplished by the settlement of a class action over the objection of those who were denied the opportunity to opt out of the class is a different question, one that requires consideration of the procedural requirements of Rule 23.
C. Rule 23 requirements — the (b)(1)(B) non-opt-out class
Normally, we would first consider the appellants' challenges to the specific criteria of Rule 23(a), especially the requirements of typicality and adequacy of representation, and then proceed to consideration of the relevant category of Rule 23(b), in this case, the appropriateness of a mandatory non-opt-out class under Rule 23(b)(1)(B). In this case, however, for reasons to be discussed, we take up these contentions in the reverse order.
The Trial Courts certified a class under Rule 23(b)(1)(B), which authorizes a class action where:
(1) the prosecution of separate actions by ... individual members of the class would create a risk of ...
(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests[.]
In their view, this case presented the sort of “limited fund” for which the Advisory Committee’s note to the 1966 amendment of Rule 23 makes a (b)(1)(B) class “plainly” available — “when claims are made by numerous persons against a fund insufficient to satisfy all claims.” Fed.R.Civ.P. 23 advisory committee’s note to 1966 amendment; see Asbestos Litigation II, 129 B.R. at 825.
The Trial Courts concluded that the insolvency of the Manville Trust rendered it a “limited fund.” Plainly, insolvency does not present the classic instance of a “limited fund,” such as would be involved if a group of claimants asserted claims of an aggregate amount that would deplete a fixed sum of money. Whether, and for what purposes, (b)(1)(B) may be used with respect to an insolvent entity are perplexing issues that we would have expected to have received more extended consideration than is apparent in the cases thus far decided.
With respect to aggregate claims in excess of a fixed sum of money, a (b)(1)(B) class action is appropriate to avoid an unfair preference for the early claimants at the expense of later claimants. With respect to an insolvent entity, however, bankruptcy law is normally the source of protection to assure a fair and orderly distribution of assets insufficient to meet claims. Insolvency exerts powerful pressures upon contending creditors to compromise their positions so that a fair distribution of assets is achieved — through a reorganization that contemplates the continuation of the *736 debtor where feasible, and otherwise through liquidation. To lessen the risk that these pressures will lead to unfair compromises, bankruptcy law provides numerous safeguards not contained in class action procedures. For example, for a plan of reorganization to be approved, the plan must be put to a vote of all members of impaired classes of creditors, 11 U.S.C. § 1126, the vote is taken only after a solicitation based on a detailed description of the plan, id. § 1125, the plan can be “crammed down” over the objection of a dissenting class of creditors only if strict fairness standards are met, id. § 1129(b)(1), and the plan may not be imposed against the wishes of an impaired class that would fare better under liquidation, id. § 1129(a)(7).
By contrast, Rule 23 is less elaborate in its protections, for example, permitting named representatives of a class, or subclass, to consent to a settlement that binds all the members of the class, or subclass, without a vote of the class or subclass members. And there is no option for those who would fare better under liquidation than under settlement of the class action followed by reorganization to insist on liquidation.
These differences raise a substantial question whether a class action may be used to adjust claims against an insolvent entity that is eligible for bankruptcy protection. And, even if, in the context of insolvency, a “limited fund” class action may be used for its traditional purpose of effecting a pro rata reduction of all claims, see Dickinson v. Burnham, 197 F.2d 973 (2d Cir.1952), cert. denied, 344 U.S. 875, 73 S.Ct. 169, 97 L.Ed. 678 (1952), an even more substantial question is raised as to whether a class action may be used against an insolvent entity to adjust the claims of creditors vis-a-vis each other, without observing the protections that would be available under bankruptcy law.
Thus far, with one notable exception to be discussed below, courts have moved sparingly in approving class action settlements that adjust creditors’ claims vis-a-vis each other against insolvent entities through the use of a mandatory non-opt-out (b)(1)(B) class. In upholding the use of a (b)(1)(B) “limited fund” class, the Trial Courts relied on two class action rulings of the Eastern District (both rendered by Judge Weinstein), which were affirmed by this Court. See County of Suffolk v. Long Island Lighting Co., 710 F.Supp. 1407 (E.D.N.Y.1989), aff'd, 907 F.2d 1295 (2d Cir.1990); In re Agent Orange Product Liability Litigation, 100 F.R.D. 718 (E.D.N.Y.1983), aff'd, 818 F.2d 145 (2d Cir.1987), cert. denied, 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 647 (1988). Our affirmance of those rulings does not support the (b)(1)(B) non-opt-out class certified in this case. In Suffolk County, we faced no issue of the propriety of a (b)(1)(B) class. The class action issue was whether the District Judge had exceeded his discretion in allowing one member of the class to opt out. We ruled he had not. 907 F.2d at 1302-05. In Agent Orange, we upheld the certification of a (b)(3) class because of the centrality of one major issue — the military contractor defense, and we found it unnecessary to consider the propriety of a (b)(1)(B) class. 818 F.2d at 163-67.
An earlier decision of this Court in the Agent Orange litigation is arguably more pertinent. In In re Diamond Shamrock Chemicals Co., 725 F.2d 858 (2d Cir.1984), we declined to issue mandamus to vacate Judge Weinstein’s certification of a (b)(1)(B) class limited to the issue of punitive damages. The denial of mandamus does not imply approval, but, in any event, we note that the (b)(1)(B) punitive damages class was not certified to permit the involuntary adjustment of the rights of competing creditors with claims against an insolvent entity. Diamond Shamrock presented a situation much closer to the traditional concept of a limited fund than occurs whenever an entity becomes insolvent. Though the potential amount of aggregate punitive damages had not yet been determined, that amount was finite and was not claimed to have rendered the defendant insolvent. The (b)(1)(B) class was thought appropriate because the recoveries of early successful claimants for punitive damages would quickly reach a total sufficient to assure *737 deterrence, thereby precluding later claimants as a matter of law.
Given the large number of potential claimants ... and given the fact that punitive damages ought in theory to be distributed on a basis other than the date of trial, the argument against [the class action] ruling does not justify mandamus.
Id. at 862. There was no prospect of the involuntary revision of the rights of competing creditors in contemplation of insolvency. No bankruptcy protections were circumvented.
We also take note of the following dictum in Green v. Occidental Petroleum Corp., 541 F.2d 1335 (9th Cir.1976):
It is conceivable of course, that the claims of named plaintiffs would be so large that if the action were to proceed as an individual action the decision “would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.” Fed. R.Civ.P. 23(b)(1)(B). This would be the case where the claims of all plaintiffs exceeded the assets of the defendant and hence to allow any group of individuals to be fully compensated would impair the rights of those not in court.
Id. at 1340 n. 9. That dictum implied the possible availability of a (b)(1)(B) class action in the context of an insolvent entity, but had no occasion to go further and reckon with the prospect of using such a device to achieve the involuntary adjustment of rights of competing creditors with claims against such an entity. We note that when the Ninth Circuit next considered the Occidental Petroleum dictum, it rejected the certification of a (b)(1)(B) class, even for purposes of punitive damage claims. See In re Northern District of California, Daikon Shield IUD Products Liability Litigation, 693 F.2d 847, 851 (9th Cir.1982).
One district court decision has certified a (b)(1)(B) class because of the likelihood that the aggregate total of claims would render the defendant insolvent. See Coburn v. 4-R Corp., 77 F.R.D. 43 (E.D.Ky.1977). That decision, however, had no occasion to reckon with the objection that the class action device might be used to circumvent bankruptcy procedures. Nor did it involve an involuntary modification of creditors’ rights vis-a-vis each other, such as abrogation of the clear order-of-filing priority of rights enjoyed by the objecting health claimants in the pending litigation.
If the cases discussed to this point exhausted our jurisprudence, we would seriously doubt whether a mandatory non-opt-out (b)(1)(B) class action may be used to readjust the rights of creditors vis-a-vis each other against an insolvent entity. Though we recognize that the Bankruptcy Rules make Rule 23 of the Civil Rules applicable to adversary proceedings, see Fed.R.Bankr. 7023, we would be wary of any class action settlement that accomplished more than a liquidation and pro rata reduction of the claims of a group of creditors and risked circumvention of Bankruptcy Code protections. See In re Shulman Transport Enterprises, Inc., 21 B.R. 548, 551 (Bankr.S.D.N.Y.1982) (“[A] bankruptcy court must consider the fact that in most instances class action principles are antithetical to those in bankruptcy.”), aff'd, 33 B.R. 383 (S.D.N.Y.1983), aff'd, 744 F.2d 293 (2d Cir.1984). However, respect for the binding force of precedent within this Circuit obliges us to take careful note of the recent decision in In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285 (2d Cir.), cert. filed, 61 U.S.L.W. 3151 (Aug. 13, 1992), which approved a more adventuresome use of a class action settlement to make a non-uniform adjustment of creditors’ rights against an insolvent entity.
Drexel involved claims by purchasers of securities sold by the ill-fated firm of Drexel Burnham Lambert. A forerunner of the case was a suit filed by the Securities and Exchange Commission against Drexel seeking, among other things, disgorgement of profits it had made, allegedly on unlawful transactions. The SEC’s suit was settled by Drexel’s payment of $200 million into a fund for defrauded purchasers, with the fund to be augmented by an additional payment of $150 million. Before the sec *738 ond payment was made, Drexel filed for reorganization under Chapter 11.
Judge Pollack, before whom were pending suits by many of the defrauded purchasers, then supervised the filing and settlement of a class action, which is highly pertinent to the issues we face in the pending appeal. After the claims of the defrauded purchasers were withdrawn from bankruptcy jurisdiction pursuant to 28 U.S.C. § 157(d) on the ground that they involved issues arising under the securities laws, an elaborate settlement of the claims was reached through the formation of a class action. The principal elements were the division of the purchaser claimants into two subclasses and the specification of the payment rights of each subclass. Subclass A, which held claims with a face amount of $20 billion, was to receive 75 percent of the $350 million fund, plus 75 percent of stated percentages of the liquidation value of various Drexel assets.[6] In addition Subclass A was to pool with Drexel the proceeds from the suits each had against officers and directors of Drexel. Subclass B, which held claims with a face amount of $3.6 billion, was to receive 25 percent of the $350 million fund plus 25 percent of the stated percentages of the funds resulting from liquidation of Drexel assets, but had no participation in the pooling arrangement with respect to suits against Drexel officers and directors.
The judgment approving the settlement was affirmed by this Court, over the objection of some members of Subclass B. Drexel, 960 F.2d at 292-93. A major contention of some of the appellants was that the use of a mandatory non-opt-out (b)(1)(B) class constituted an impermissible circumvention of bankruptcy law protections. See, e.g., Brief for Appellants Liggett Group Inc. and Liquid Green Trust at 43-45. Though the opinion contains no explicit consideration of this contention, the Court’s affirmance, in the face of a detailed presentation of the argument, must be regarded as a holding that, at least in the circumstances of the Drexel case, a mandatory non-opt-out (b)(1)(B) class action may be used to accomplish some readjustment of creditors’ rights against an insolvent entity, without observing the protections of bankruptcy law.[7]
Especially pertinent to the pending appeal is the designation of subclasses in Drexel for settlement purposes. Recognizing that Subclasses A and B were being treated differently, the District Court accepted the settlement only after receiving the consent of representatives of each of the subclasses, who were adjudged to fairly and adequately represent the interests of all of the members of their respective subclasses.
Drexel acknowledges that class actions are not normally to be used in the context of bankruptcy. 960 F.2d at 292. Two circumstances not present in the pending case may have influenced the decision to approve the class action settlement. First, the case involved, at least in part, a traditional limited fund, since the claimants were asserting claims against the $200 million paid by Drexel to the fund assembled by the SEC and to the additional $150 million to be paid to that fund. Second, the settlement was regarded by this Court as a necessary prerequisite to a successful reorganization plan. Drexel, 960 F.2d at 293. By contrast, the pending case involves a “limited fund” only in the sense that, like any insolvent entity, the assets of the Man-ville Trust, including its income stream, are insufficient to pay present and future claims. And the class action here is not a *739 prerequisite to a reorganization, but a change in rights already established in a confirmed and substantially consummated plan of reorganization. Indeed, it is arguable that the Settlement in the pending case, by abandoning the order-of-payment priority, accomplishes a more substantial adjustment of creditors’ rights than occurred in Drexel, where creditors with only an expectation of recovery in effect had those expectations valued by being relegated to specified percentages of different asset pools for their recoveries. These differences make us somewhat skeptical of permitting the use of a mandatory non-opt-out class in this case. But, though the question is close, we are not persuaded that the need to insist on bankruptcy law protections is greater in this case than it was in Drexel, and the reasonableness of using a (b)(1)(B) non-opt-out class is at least as compelling in this case as in Drexel.
We are therefore willing to permit the use of such a class action in the pending case, so long as there exists, as occurred in Drexel, appropriate designation of subclasses to provide assurance that the consent of groups of claimants who are being treated differently by the settlement is being given by those who fairly and adequately represent only the members of each group. The inevitable tension between the limited protections of Rule 23 and the more complete protections of the Bankruptcy Code is strained by any use of a mandatory non-opt-out class to settle claims against an insolvent entity that is subject to bankruptcy jurisdiction. But that tension reaches the breaking point when, instead of the traditional limited fund settlement that achieves a pro rata reduction of the claims of all members of the plaintiff class, the rights of the plaintiff class are revised vis-a-vis each other and consent to the resulting settlement is given by representatives who purport to represent the undifferentiated class of plaintiffs as a whole, rather than the interests of each of the subclasses whose rights are being altered. We therefore proceed to an examination of the appellants’ contentions regarding the lack of subclasses, mindful that these contentions require careful scrutiny in the unusual context where settlement of a class action is used to readjust creditors’ claims against an insolvent entity, without observance of the protections that would otherwise be available under the Bankruptcy Code.
D. Rule 23 requirements — the class definition
1. Objection of the co-defendant manufacturers. The co-defendant manufacturers object to the class definition on the ground that it improperly places them within the same class as the health claimants, a grouping that they contend violates the typicality and adequacy of representation requirements of Rule 23(a)(3) and (4). We agree with their objection. The health claimants and the co-defendant manufacturers have been adversaries for many years in thousands of lawsuits in courts throughout the country. Their interests are profoundly adverse to each other. The health claimants wish to receive as much as possible from the co-defendant manufacturers, and the latter wish to hold their payment obligations to a minimum. More significantly, this adversity was at the heart of one important aspect of the proposed restructuring of the Trust — the provisions of Section H of the Settlement adjusting the co-defendant manufacturers’ rights to contribution and setoff. The co-defendant manufacturers assert that the effect of Section H is to shift hundreds of millions of dollars of Manville asbestos liability to the co-defendants. Whether or not that adjustment is “fair” and whether or not it can be made in disregard of applicable state law, it surely cannot be made in a settlement on behalf of a single class that includes both the health claimants and the co-defendant manufacturers. The conflict is overwhelming. See National Super Spuds, Inc. v. New York Mercantile Exchange, 660 F.2d 9 (2d Cir.1981); Plummer v. Chemical Bank, 668 F.2d 654 (2d Cir.1982).
The Trial Courts maintained that the health claimants and the co-defendant manufacturers shared a common interest in maximizing the resources of the Trust and assuring an equitable distribution of its *740 funds. See Asbestos Litigation II, 129 B.R. at 820-21. That is so. That commonality of interest might well permit a single class to obtain relief as to which adversity was not present, e.g., removal of a trustee for breach of fiduciary duties, or a request for more expeditious claims processing. But the class of health claimants cannot possibly represent the class of co-defendant manufacturers in determining what rights the latter will have against the Trust by way of contribution or setoff, a determination that directly affects the value of the health claimants’ claims against the manufacturers.
Nor does the fact that both groups were within the category of Class-4 creditors in the reorganization permit their grouping within a single class in this lawsuit. In the first place, the standards of section 1122 of the Bankruptcy Code and those of Rule 23 are not the same. But, more significantly, the interests of the two groups were aligned together in the reorganization, in which their only interest was to maximize the percentage of recovery from Manville of whatever claims they held under state law. In the class action, however, their interests diverge to the extent that they seek to modify those state law rights to their respective advantage. If a class action is to be used to modify contribution and setoff rights, then as to the adjudication or settlement of such issues, see Fed. R.Civ.P. 23(c)(4), the health claimants and the co-defendant manufacturers must be placed in separate classes.
Since we hold that the inclusion of both groups within a single class violates the requirements of Rule 23, we need not consider the related issue on the merits of whether the provisions of Section H improperly impair state law rights. However, since the issue might arise in the future, we deem it advisable to caution against the Trial Courts’ effort to mitigate the potential consequences of provisions such as those contained in Section H through the device of “interpreting” those provisions in the Trial Courts’ opinion. See Asbestos Litigation II, 129 B.R. at 894-905. We agree with the co-defendant manufacturers that, whatever provisions may ultimately be ordered respecting their rights, those rights must be spelled out in the operative language of the Trial Courts’ judgment, not left to the uncertainties attending the understanding that state and federal courts throughout the country might gain from reading the pertinent passages of a 525-page opinion. It is one thing to expect the Trial Courts to absorb the directions in this extensive opinion, which is directed solely to them in disposition of a direct appeal from their judgment. It is quite another to expect other courts to notice selected passages in an opinion collaterally affecting the thousands of cases pending before them and to apply the open-ended standards of those passages in mitigation of the provisions of the Trial Courts’ judgment.
Whether the co-defendant manufacturers as a class can negotiate an agreement with the Trust and with the health claimants with respect to the contribution, indemnity, and setoff rights of co-defendant manufacturers remains to be seen in the proceedings that will follow our remand. We deem it advisable not to interfere with those negotiations by intimating any views with respect to the substantive validity of any of the existing Section H provisions or the Trial Courts’ interpretation of those provisions.
Special mention must be made of the position of appellant MacArthur Company, a distributor of Manville products.[8] During the reorganization, MacArthur objected to Manville’s settlements with its insurers. MacArthur alleged protection under the insurers’ policies pursuant to a vendor endorsement protecting distributors. On a prior appeal, we rejected MacArthur’s challenge, ruling that MacArthur “may proceed in the Bankruptcy Court against the $770 million [insurance] settlement fund.” MacArthur Co. v. Johns-Manville Corp., 837 F.2d 89, 94 (2d Cir.), cert. denied, 488 U.S. *741 868, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988). Thereafter MacArthur entered into what it thought was a settlement with the Trust of all of its then existing and future claims against Manville. The Trust subsequently-disagreed that a settlement had been reached. MacArthur then brought an adversary proceeding in the Bankruptcy Court to enforce the settlement it alleged and to secure payment from the proceeds of Manville’s insurance. That proceeding was settled in an elaborate agreement (“the MacArthur Stipulation”), executed by MacArthur, the Trust, the Debtor, the health claimants, the legal representative of the future health claimants, and various insurers, and approved by the Bankruptcy Court on October 30, 1989. MacArthur received $8 million and expressly retained its right to assert indemnity and contribution claims against the Trust with respect to asbestos claims that MacArthur had not paid as of August 1,1988; this right was to be asserted “in accordance with the Plan and this Stipulation,” MacArthur Stipulation ¶ 10, and was expressly permitted to be pursued “in any court of competent jurisdiction” in the event that MacArthur and the Trust could not resolve specific indemnity or contribution claims, id. ¶ 11. MacArthur released all of its rights to the proceeds of the insurance policies. Id. 1114.
In the proceedings leading up to the class action settlement in the Trial Courts, MacArthur took the position that its prior Stipulation, already approved by the Bankruptcy Court, was immune from modification. The Trial Courts disagreed. In their view, MacArthur’s rights were subject to modification in the same manner as those of all other Manville co-defendants. “To the extent that MacArthur’s rights are altered by the' Settlement, they like all codefendants, must accommodate the Trust’s limited fund status.” Asbestos Litigation II, 129 B.R. at 900. The Trial Courts were particularly concerned that MacArthur not be permitted to precipitate litigating expenses for the Trust. “MacArthur will not be permitted to drag the Trust into litigation.” Id. at 901. Accordingly, MacArthur’s rights pursuant to the MacArthur Stipulation were modified, over its objection, by virtue of the class representatives’ consent to the Settlement of the class action.
Our ruling that the co-defendant manufacturers may not be placed in the same class as the health claimants for purposes of settling aspects of a class action in which their interests are adverse (together with our subsequent ruling with respect to the Trial Courts' exercise of bankruptcy jurisdiction) spares MacArthur the consequences of the Settlement. Nevertheless, since the issue may well recur, we make these further observations. In any class action, not only must the co-defendant manufacturers be placed in a subclass distinct from the health claimants, but MacArthur may not be placed in the same subclass as the co-defendant manufacturers, at least not with respect to the adjudication or settlement of any issue as to which adversity of interests exists. The co-defendant manufacturers have asserted the position in various pending lawsuits that MacArthur (as a distributor), rather than the co-defendant manufacturers, is responsible for Manville’s share of any liability to the health claimants. This adversity transcends whatever disagreement may exist among the co-defendant manufacturers as to their respective shares of responsibility for injury to health claimants in individual lawsuits. The co-defendant manufacturers are adverse to MacArthur with respect to any modification of the Trust payment procedures that diminishes MacArthur’s ability to pursue its indemnity claims against the Trust to whatever extent the co-defendant manufacturers thereby benefit. If, on remand, issues are sought to be resolved in a class action as to which MacArthur and the co-defendant manufacturers are adverse, subclasses must be created, at least as to such issues. See Fed.R.Civ.P. 23(c)(4).
2. Objection of the health claimants. Within the category of health claimants, marked differences exist between identifiable subgroups that require division of the health claimants themselves into appropriate subclasses. The first difference results from a combination of the payment *742 procedures of the Manville Trust, as originally established, and the insolvency of the Trust. It will be recalled that the Claims Resolution Procedures, contained in Annex B to Exhibit C of the Plan, established a strict order-of-filing priority to govern payment of all health claims. Once the Trust became insolvent, the effect of the payment priority was to divide the health claimants into two subgroups. The first subgroup comprises those claimants with sufficiently early filing dates to assure the full payment of their claims before the Trust runs out of money. The second subgroup comprises those with later filing dates who will receive no payments at all: the Trust will run out of cash by the time their payment priority is reached. Plainly, the members of each of these subgroups have sharply conflicting interests with respect to the maintenance of the order-of-filing priority.
The Settlement abandons the order-of-filing priority for all health claimants. That abandonment will have entirely different effects upon each of the two subgroups of health claimants, the early and late priority subgroups. For those whose early filing dates would have assured them of full payment before the Trust runs out of cash, the change is a distinct disadvantage, relegating them to a new allocation formula under which 100 percent payment is replaced by an expectation of 45 percent payment if they are in Level One and a delayed and less likely prospect of 45 percent payment (depending on the value of Manville shares) if they are in Level Two, followed by highly uncertain prospects of payment of the balance of their claims. For those whose later filing dates would have left them with no recovery because the Trust would have run out of money by the time their priority was reached, the change is a distinct advantage, assuring them of some prospect of a 45 percent recovery if they are in Level One, and some prospect of a delayed 45 percent (or lower) recovery if they are in Level Two.
The Settlement also creates a distinction among health claimants based on the seriousness of their illnesses. Though all health claimants would have expected to receive differing amounts of recoveries from the Trust, based on the relative seriousness of their illnesses and the resulting extent of damages, the Settlement superimposes upon this anticipated range of recoveries an absolute distinction, according to whether the health claimants are placed in Level One or Level Two. Though the Settlement has as its ultimate objective the achievement of comparable rates of recovery of claims for members of both pools, it imposes a marked preference for those in Level One over those in Level Two. Equivalent recoveries of 45 percent of the amount of each claimant’s liquidated claim will not be achieved unless the value of Manville shares reaches $24 or $25, compared to the $4-$5 price range prior to the Settlement. At lesser share prices, those in Level Two will receive a significantly lower proportion of the liquidated value of their claims than those in Level One. Even in the highly unlikely event that this extraordinary increase in share price is achieved, the Settlement proposes to treat the two groups differently by paying Level One claimants two years ahead of Level Two claimants. Indeed, the whole point of dividing the health claimants into the two levels is to recognize that those in Level One are the more seriously ill and to provide them not only with the increased damage awards they would normally expect to receive, compared to Level Two claimants, as a result of liquidation of their claims, but also with the likelihood of achieving a higher percentage recovery of such liquidated values, resulting from the differing treatments of Level One and Level Two claims.
The distinction between the subgroup that benefits from the payment priority and the subgroup that loses because of it, and the further distinction, imposed by the Settlement, between payment prospects for those in Level One compared to those in Level Two make it clear that there cannot be consent to a settlement imposing these distinctions upon all health claimants unless subclasses are established for the affected subgroups and consents are given by fair and adequate representatives who *743 have undivided loyalties only to members of their respective subclasses.
In an eloquent dissent, Judge Feinberg disagrees with our conclusion that subclasses must be established before valid consents to the settlement may be obtained that are binding on the high priority health claimants. He contends that the FIFO payment procedure is a relatively minor aspect of the Plan, the abandonment of which in the Settlement does not deprive the high priority health claimants of substantial rights requiring subclass designation. His point is that since those who negotiated the Plan expected all beneficiaries to be paid, a hope shared by this Court in approving the Plan, see Kane, 843 F.2d at 650, the FIFO procedure assured high priority claimants only early payment. In his view, the “most that can reasonably be said for FIFO is that it seemed like an efficient procedure when the Trust Agreement ... was drafted.” See infra at 754. We disagree. Efficiency is perhaps the least that can be said for the FIFO procedure. The most that can be said is that it provided the high priority claimants with the valuable assurance of full payment in the event that the hoped for success of the Trust was not realized. The point is forcefully made to us in this very appeal, ironically, by those defending the Settlement. In their joint papers challenging the Interim Rule 706 Report, the class action plaintiffs and the trustees describe the creation of the FIFO payment procedures in these words:
While it was assumed by some and hoped by others that in the long run the Trust’s assets would match its liabilities, the CRP [the Claims Resolution Procedures of the Trust] were drafted with the clear understanding that the Trust would pay as many claims in full as possible in FIFO order until its assets were exhausted, and that those claimants who came afterward, if any, would be left without compensation from the Trust.
Reply Brief in Further Support of the Petition for Mandamus at 7. Plainly, the high priority health claimants obtained valuable rights by incorporating the FIFO payment procedure into the Plan documents.
We recognize that the Trial Courts expressed the view that “[t]he class representatives include persons who would qualify as Level Two claimants under the Settlement.” Asbestos Litigation II, 129 B.R. at 859. However, that observation, even if we assume support in the record,[9] does not meet the objectors’ contention that their rights have been abrogated upon the consent of persons who do not represent their interests. In the first place, the Trial Courts did not purport to find that any of the class representatives have early priority rights that would have entitled them to full payment prior to the Settlement. Moreover, where differences among members of a class are such that subclasses must be established, we know of no authority that permits a court to approve a settlement without creating subclasses on the basis of consents by members of a unitary class, some of whom happen to be members of the distinct subgroups. The class representatives may well have thought that the Settlement serves the aggregate interests of the entire class. But the adversity among subgroups requires that the members of each subgroup cannot be bound to a settlement except by consents given by those who understand that their role is to represent solely the members of their respective subgroups.
Initially, the health claimants must be divided into subclasses comprising those whose priority under the original payment *744 procedures would have entitled them to full payment and those whose later priority would have resulted in no payments at all, because of the insufficiency of the Trust’s resources. Identification of these subclasses will require some estimation to determine how far down the priority order of claims payments would be made in full before the Trust is expected, under its original funding terms, to run out of money. Though the dividing line can only be approximated, it should not be difficult to identify representatives of each of the groups that are clearly on each side of the line, so that their consents, if forthcoming, may be relied upon to bind all the members of each subgroup to the Settlement, or some new variation of it.
Once the health claimants have been divided into two priority-of-payment subclasses, a further sub-division of each subclass is required to reflect the Settlement’s division of health claimants between Level One and Level Two. The interests of the health claimants within each priority subclass diverge sharply with respect to payment formulas, once payment priority has been abandoned. High priority claimants in Level One cannot fairly and adequately represent the entire subclass of high priority claimants, consigning thousands of subclass members to Level Two, nor can low priority claimants in Level One fairly and adequately represent the entire subclass of low priority claimants, consigning thousands of these subclass members to Level Two. Thus, before any settlement can be approved, the health claimants must be divided into at least two subclasses — the high priority claimants and the low priority claimants, reflecting the initial adversity among the entire group of health claimants once the Trust became insolvent. If a settlement purports to make significant distinctions among the rights of health claimants, then these initial subclasses must be further divided to reflect whatever adversity results from the settlement. For valid approval of the current Settlement, for example, there would have to be four subclasses — the high priority claimants in Level One, the high priority claimants in Level Two, the low priority claimants in Level One, and the low priority claimants in Level Two.
Observance of subclass requirements before any settlement is involuntarily imposed upon all the health claimant beneficiaries of the Trust through the consent of “representatives” is especially important in this case for two reasons. First, as we have already discussed, the use of a class action settlement, imposed upon all members of a mandatory non-opt-out class, in the context of an insolvent defendant, creates a risk that the protections of bankruptcy law will be circumvented. Drexel committed this Circuit to the acceptance of that risk, and we are obliged to follow the force of that precedent. But Drexel took that step only where the significant differences among the class members were recognized by the creation of appropriate subclasses. If a class action settlement is to be permitted in the insolvency context, in which adjustment of creditors’ rights would normally be accomplished pursuant to the Bankruptcy Code, there must be careful observance of subclass requirements. No members of a significant subclass can be mandatorily bound by the consent of “representatives” in the context of this litigation unless those representatives have undivided loyalty only to subclass members.
Second, the need for careful observance of subclass requirements among the health claimants is underscored by the questionable state law basis for the readjustment of trust beneficiaries’ rights accomplished by the Settlement. The Trial Courts asserted, “Under New York trust law, as in most jurisdictions, courts are permitted to direct trustees to deviate from the terms of the trust when unanticipated emergencies arise which threaten to frustrate the purpose of the trust.” Asbestos Litigation II, 129 B.R. at 845. Reliance was placed on In re Pulitzer’s Estate, 139 Misc. 575, 249 N.Y.S. 87 (N.Y.Sur.Ct.1931), which approved the sale of a trust asset, contrary to a prohibition in the trust instrument, in order to protect the beneficiaries from substantial losses, and on Restatement (Second) of Trusts § 167(1) (1935).
*745 That authority, as the Trial Courts recognized, has been invoked in New York and elsewhere to permit a change in a trust’s provisions for the benefit of all beneficiaries, but, as a leading commentator in the field has observed, citing numerous cases from eight jurisdictions across the country, “The court will not, of course, permit deviation from the terms of the trust in such a way as to benefit some of the beneficiaries at the expense of others.” See IIA William A. Fratcher, Scott on Trusts § 167, at 287 (4th ed. 1987) (footnote omitted) (emphasis added). In the only instance cited by the Trial Courts in which a New York court was asked to depart from the terms of a trust instrument to benefit one beneficiary at the expense of other beneficiaries. In re Albert, 111 Misc.2d 884, 445 N.Y.S.2d 355 (N.Y.Sup.Ct.1981), the court refused to do so, holding inapplicable even the limited statutory authority, see N.Y. Est. Powers & Trusts Law § 7-1.6 (McKinney 1992), authorizing invasion of a trust corpus to provide increased income to an income beneficiary where either that beneficiary himself is “indefeasibly” entitled to the principal or consents are given by all persons beneficially interested in the trust.
In the Trial Courts’ view, the Settlement is a permissible modification of the Trust Agreement because it varies the terms of the Agreement only to carry out one of the specified purposes of the Trust — to use Trust assets “to deliver fair, adequate and equitable compensation to bona fide Beneficiaries.” Trust Agreement § 2.02(i).[10] Recognizing that the Settlement benefits some beneficiaries at the expense of others, the Trial Courts adopted a utilitarian approach, observing that “the proposed modifications generally will have the effect of benefitting most current claimants, later-filing claimants and future beneficiaries at the expense of a relatively few present claimants and their lawyers.” Asbestos Litigation II, 129 B.R. at 846. We have no dispute with the curtailment of the lawyers’ fees, but we have substantial doubts whether New York trust law would allow a New York surrogate to adjudicate the significant alteration of the beneficiaries’ rights accomplished by the Settlement.
Since the class action complaint did not explicitly seek a revision of beneficiaries’ rights vis-a-vis each other, there was no adequate opportunity to test the legal sufficiency of the changes wrought by the Settlement by a claim-testing motion to dismiss the complaint. Once the Settlement was reached and tendered to the Trial Courts for approval, the issue became not whether the alteration of beneficiaries’ rights could have been adjudicated in a contested proceeding, but only the lesser question of whether the alteration had a sufficiently plausible basis in state law to make the Settlement a reasonable compromise of the lawsuit. At a minimum, the substantial question that arises as to whether state law permits such alteration of beneficiaries’ rights requires that a settlement binding upon all the health claimant beneficiaries have the separately obtained consents of representatives who fairly and adequately speak for each of the significant subclasses.
Of course, our insistence on subclasses to reflect the adverse interests of the subgroups affected by the Settlement is premised on the Trial Courts’ use of Rule 23(b)(1)(B) on a mandatory non-opt-out basis. If, on remand, the existing Settlement, or some revision of it, can be achieved under Rule 23(b)(3) with objectors permitted to opt out, we would not require the health claimant beneficiaries to be subdivided into subclasses.
IV. EXERCISE OF BANKRUPTCY JURISDICTION
Though the Trial Courts relied primarily on the exercise of diversity jurisdiction and the application of Rule 23(b)(1)(B) as authority to approve the Settlement restructuring the Trust, they also invoked their bankruptcy jurisdiction to some un *746 specified extent. We therefore proceed to inquire whether approval of the Settlement is valid in the exercise of the Trial Courts’ bankruptcy jurisdiction. The objecting health claimants contend that the modification of their rights as Class-4 creditors is not authorized by the Plan or its attached documents and, in any event, violates section 1127 of the Code. We consider first the amending authority within the Plan.
A. Amending authority within the Plan
The modification of the rights of the Class-4 claimants is accomplished under the Settlement by an amendment of the document entitled “Claims Resolution Procedures,” which is Annex B to the Trust Agreement. All sides agree that this Annex B is a Plan-related document; it is an annex to the Trust Agreement, which, in turn, is Exhibit C of the Plan. To determine the authority for the modification within the documents themselves, we turn first to the Plan.
Section 11.6 of the Plan, concerning amendment of Plan-related documents, provides:
Amendments. The authority of the Company, the Trustees, the PD Trustees and holders of Claims to agree to modifications, supplements or amendments of or to the agreements and instruments attached as Exhibits hereto or as Annexes to any such Exhibit shall be as provided in such agreements and instruments.
The Trial Courts, after citing this authority, invoked the amending authority of the Trust Agreement. Section 6.03(a) of the Trust Agreement provides:
Amendments, (a) The Company ... and the Trustees ... may, after consultation with Selected Counsel for the Beneficiaries, modify, supplement or amend this Trust Agreement [with exceptions not relevant to this dispute] in any respect____
The Trial Courts apparently reasoned that the explicit authority to amend the Trust Agreement carried over to the six annexes attached to the Trust Agreement, including Annex B, with which we are concerned. We cannot agree.
Though we might have expected the drafters to provide that the authority to amend the Trust Agreement carries over to all of the documents appended to it, they chose a different approach. The Plan expressly provides that the authority to amend “agreements and instruments attached as Exhibits hereto or as Annexes to any such Exhibit shall be as provided in such agreements and instruments.” Plan § 11.6 (emphasis added). Annex B contains no amending authority whatsoever. This omission is striking when Annex B is compared to other Plan-related documents.
First, we note that four of the six annexes to the Trust Agreement contain their own amending authority, varying somewhat as to who has the power to amend and, in one instance, specifically excluding one provision from the scope of the amending authority. Annex A is the bylaws of the Trust; article IV of the bylaws authorizes amendment by the Trustees. Annex C is the Manville Personal Injury Settlement Trust Supplemental Agreement; section 6.02 of the Supplemental Agreement authorizes amendment by agreement of Manville and the Trust, but excludes section 6.13, concerning certain liens, from amendment. Annexes D and E are Man-ville Corporation bonds; section 5.2 of each bond authorizes amendment by Manville and the Trust. Annex F, which concerns co-defendant procedures, has no amendment provision.
Second, we note that the absence of any explicit amending authority concerning the Claims Resolution Procedure of the PI Trust stands in marked contrast to the explicit provisions for amendments to the Claims Resolution Procedure of the PD Trust. Exhibit A to the Plan is a “Glossary of Defined Terms Used in the Plan of Reorganization and in Certain Exhibits Thereto.” The Glossary defines “PD Claims Resolution Facility” to mean:
the PD Claims Resolution Facility set forth in Annex B to the PD Trust Agreement; it being understood that the PD Trustees, by a majority vote after consultation with the Company, representative counsel for the PD Beneficiaries selected *747 by the PD Trustees and any other interested parties whom the PD Trustees desire to consult, may amend, delete or add to any of the procedural provisions with respect to the operation of the PD Claims Resolution Facility except for Modifications [a term defined in section 6.03(c) of the PD Trust Agreement to mean certain changes authorized to be made after termination of the PD Trust], provided that no such amendment, deletion or addition may affect any of the substantive provisions set forth in such Annex B____
By contrast, the Glossary’s definition of the “Claims Resolution Facility” for personal injury claimants reads, in its entirety: “Claims Resolution Facility means the Claims Resolution Facility set forth in Annex B to the Trust Agreement.” Though the definition of the “PD Claims Resolution Facility” in the Glossary is a somewhat odd location for the authority to amend “procedural provisions with respect to the operation of” that facility, it is nonetheless significant that this definition includes amending authority and the definition of the personal injury facility omits amending authority.
The care with which the drafters granted and withheld amending authority in the various documents attached to the Plan persuades us to read section 11.6 of the Plan to mean, as it appears to say, that amending authority with respect to a particular Plan-related document must be found in the document itself. An exception to this approach is apparently available for the PD Claims Resolution Facility, since amending authority is contained in the definition of the term “PD Claims Resolution Facility,” and this authority is thereby arguably incorporated by reference into Annex B to the PD Trust Agreement, the annex establishing the PD Claims Resolution Facility. No comparable authority is contained in Annex B to the PI Trust Agreement, or elsewhere in the Plan or in any Plan-related document.
Apparently, the asbestos health claimants not only negotiated the FIFO principle into the terms of Annex B of the PI Trust Agreement but were also able to prevent the granting of any authority for abandonment or alteration of this principle, save only for section 10.1(H) of the Plan, which authorizes the Court to retain jurisdiction “[t]o modify any provision of the Plan to the full extent permitted by the Code.”
We conclude that the restructuring of the Trust was not permitted pursuant to any of the specific amending powers reserved to the various parties identified in the Plan and the Plan-related documents. We therefore consider whether the changes were authorized by the more general reserved power of the Bankruptcy Court to modify the Plan “to the full extent permitted by the Code.” Plan § 10.1(H).
B. Conflict with the Code
The extent to which a bankruptcy court may make changes in a confirmed reorganization plan is largely uncharted terrain. See David A. Lander & David A. Warfield, A Review and Analysis of Selected Post-Confirmation Activities in Chapter 11 Reorganizations, 62 Am.Bankr.LJ. 203 (1988). Appellants contend that the restructuring violates the Code in two respects. First, they contend, it violates the fundamental bar of section 1127(b), which prohibits modifications of a confirmed and substantially consummated plan of reorganization. Second, they contend, it violates section 1123(a)(4), which requires that a plan “provide the same treatment for each claim or interest of a particular class.”
1. Section 1127(b). The Trial Courts sought to avoid the bar of section 1127(b) by maintaining that the restructuring of the Trust was not a “modification.” We cannot agree. Even if the concept of “modification” implies some distinction between significant changes of substance, which are prohibited, and minor changes of procedure, which might be allowed, the alterations accomplished by the Settlement are both substantive and significant. Health claimants who formerly stood on an equal footing, entitled to payment in the order their claims were filed, and with jury trial rights unimpaired, emerged divided into two groups, with differing rights as to maximum amounts recoverable and as to *748 timing and rate of payments. The FIFO ordering of payments was scrapped. For all claimants, the opportunity to have a jury determine the amount of their damages was drastically curtailed by the disincentive . created by the payment of jury verdicts in excess of offers or arbitration awards only out of a secondary pool of money, unlikely to have sufficient resources to meet its obligations.
The Trial Courts additionally sought to avoid the restrictions of section 1127(b) by contending that the settlement effects no change in the Plan, but only in Plan-related documents. As the Trial Courts’ Opinion states, “We have found no case that has applied section 1127(b) to bar variations in a plan-related document.” Asbestos Litigation II, 129 B.R. at 840. That argument will not suffice. It could be said with equal conviction that no case has ever approved variations in a plan-related document, without regard to section 1127(b), where the effect is to alter substantial rights of creditors. The question remains whether a change that would contravene section 1127(b) if made in the provisions of a plan can be accomplished by modifying the provisions of a plan-related document. The answer must be no. The rights of creditors, bargained for during the negotiations that preceded the presentation and confirmation of the Plan cannot depend on whether those rights were spelled out in a document labeled “plan” or in an attached document labeled “exhibit” or “annex.” What controls is the substance of the change, not the title of the document that is changed. In this case, the Plan requires payment of the full amount of all allowed Class-4 claims. The change effectively alters that payment right. It cannot be that the change would be barred if it dealt directly with the language of section 3.4 of the Plan, defining the rights of Class-4 creditors, but can just as effectively be accomplished by amending Annex B (Claims Resolution Procedures) of Exhibit C (Trust Agreement) of the Plan.
The Trial Courts relied on our decision in In re Johns-Manville Corp., 920 F.2d 121 (2d Cir.1990) (“PD Trust?’), as authority for the proposition that the change in the rights of asbestos health claimants was not a “modification” within the meaning of section 1127. We disagree. PD Trust considered an order of the Bankruptcy Court permitting the Trustees of the Manville Property Damage Trust to suspend the operation of the PD Claims Resolution Facility as of October 31, 1992. That Facility was established by Annex B to Exhibit D of the Plan. The PD Trust represented that it could expect no significant income after that date until such time as the PI Trust no longer required Manville funds to pay claims, see PD Trust, 920 F.2d at 124, a time anticipated not to occur until 2024. The PD Trust receives a share of Manville profits only after such profits are no longer needed by the PI Trust. See Property Damage Supplemental Agreement § 2.02. The suspension was characterized as “temporary,” 920 F.2d at 122, although, as the Trial Courts in the pending litigation noted, it may well last for thirty years.
At first glance, a suspension of the operation of a claims resolution facility for thirty years appears to be a substantive modification of the most serious sort. In fact, the change authorized by PD Trust left the substantive rights of the PD claimants “unchanged,” as the decision in PD Trust noted, id. at 129. The PD Trust had no money to pay claims after 1992. However, it remained obliged to incur administrative expenses of $35 million to keep the claims resolution facility in existence during the interval before it could expect to receive income with which to pay claims. The PD Trust therefore sought permission to spare claimants the burden of these needless administrative expenses and to use the $35 million instead to pay currently liquidated PD claims that otherwise would have had to wait thirty years for payment. The order gave first-in-line holders of liquidated PD claims immediate payment and spared all other PD claimants the burden of needless administrative expenses. No substantive right was impaired in any way.[11]
*749 Moreover, even this procedural modification to spare needless administrative costs was well grounded on explicit modification authority. As explained above, the Plan’s definition of “PD Claims Resolution Facility” expressly authorized the PD Trustees to amend the procedural provisions of the PD Claims Resolution Facility. See Plan, Exhibit A. Furthermore, prior to consummation of the Plan, the PD Trustees had obtained from the Bankruptcy Court an order authorizing them to apply to the Court “for relief necessary to permit the PD Trust to fulfill its purposes under the Plan, including application ... (2) for approval of a plan providing for the modification or suspension of operations of the PD Claims Resolution Facility during cycles in which the PD Trust is not expected to have sufficient income to make payments on claims____” See PD Trust, 920 F.2d at 124. No comparable authority in Plan documents or in pre-consummation Court approval existed for the Settlement’s changes in the PI Trust modifying the rights of Class-4 claimants.
2. Section 1123(a)(4). Since the purported exercise of bankruptcy jurisdiction violates the bar of section 1127(b), we need not decide whether the Settlement also violates section 1123(a)(4) by failing to accord the “same treatment” to the health claimant members of Class-4. We have summarized the extensive changes that the Settlement makes in the rights of the Class-4 claimants in pointing out why those changes qualify as “modifications” for purposes of section 1127(b).
The Trial Courts sought to justify the acknowledged distinction between Level One and Level Two claimants on the ground that “the distinction between claimants reflects underlying differences in the nature and strength of the claims.” Asbestos Litigation II, 129 B.R. at 859. Without question, the “same treatment" standard of section 1123(a)(4) does not require that all claimants within a class receive the same amount of money. Asbestos health claimants would receive the “same treatment” if they all were permitted to present their claims to a jury and were all paid whatever amounts the jury awarded, until funds were no longer available. But some classification of claimants within a class is permissible. See In re AOV Industries, Inc., 792 F.2d 1140, 1154 (D.C.Cir.1986). Whether the Settlement permissibly classifies according to seriousness of injury or impermissibly denies health claimant creditors the “same treatment” need not be resolved, since any effort to use bankruptcy authority to accomplish the objectives of the Settlement would in any event require a second reorganization.
V. FEE CLAIM OF HENDERSON & GOLDBERG
The law firm of Henderson & Goldberg, P.C., attorneys for some of the health claimants who object to the settlement, challenge the Trial Courts’ denial of their application for fees incurred in the course of the proceedings that culminated in the approval of the Settlement. The law firm contends that it conferred a benefit upon the class by advancing the views of a significant number of class members. Though the Magistrate Judge allowed the fee claim, the Trial Courts rejected it, and we see no basis for deeming that rejection beyond the wide latitude accorded district courts in determining whether to award fees for services alleged to have benefited a class. See Van Gemert v. Boeing Co., 573 F.2d 733, 736 (2d Cir.), vacated on reh’g on other grounds, 590 F.2d 433 (2d Cir.1978) (in banc), aff'd, 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980). The law firm has not identified any concrete benefit that its efforts conferred on the class.
*750 VI. THE INTERIM RULE 706 REPORT
The objectors to the Interim Rule 706 Report, the class representatives and the Trustees, assert that the April 22 order approving the Report was entered in the class action. However, it was also entered in the Chapter 11 reorganization proceeding. Wholly apart from the authority of the District Court to appoint Rule 706 experts in connection with determining the fairness of the Settlement of the class action, we have no doubt of the Court’s authority to exercise its bankruptcy court powers to appoint experts to advise it on matters that concern the ongoing administration of the Chapter 11 proceeding. Thus, we need not pause to consider the objectors’ contentions that the April 22 order is invalid as allegedly in conflict with the mechanism contemplated by the Settlement for estimation of future claims and resolution by arbitration of any allocation disagreements between the present claimants and the Trustees. Even if such conflict exists (a moot point in view of our invalidation of the Settlement on other grounds), the parties to the Settlement lack the power to impair the authority of the Bankruptcy Court to exercise its retained powers under the Plan to implement the Plan.
The Plan expressly provides that the Court shall retain jurisdiction for various purposes, including “[t]o determine any and all disputes arising under the Plan, the Trust Agreement ... and the Settlement Agreements,” “[t]o enforce and administer the provisions of the Plan,” and “[t]o enter such orders as may be necessary or appropriate ... to facilitate implementation of the Plan.” Plan § 10.1(B), (G), (L). The objectors contend that none of these reserved powers authorizes the Bankruptcy Court to appoint experts who, in the objectors’ view, will inevitably be encroaching on the fiduciary responsibilities of the Trustees. We disagree. The Trust is not an ordinary private undertaking of a settlor to carry out private preferences. It is the mechanism established under the auspices of the Bankruptcy Court to implement a plan of reorganization. The Bankruptcy Court has continuing responsibilities to satisfy itself that the Plan is being properly implemented. See In re Dilberts’ Quality Supermarkets, Inc., 368 F.2d 922, 924 (2d Cir.1966); In re Johns-Manville Corp., 97 B.R. 174, 180 (Bankr.S.D.N.Y.1989). Toward that end, it is fully entitled to avail itself of expert advice on the difficult matter of estimating future claims against the Trust. Whether or not the rendering of advice by such experts would encroach on the fiduciary responsibilities of trustees of a purely private trust, a matter we need not decide, such advice entails no legally cognizable impairment of the role of trustees of the Manville Personal Injury Settlement Trust. And we have no doubt that the role of the experts is within the broad authority of Rule 706. See Scott v. Spanjer Bros., Inc., 298 F.2d 928, 930 (2d Cir.1962); J. Weinstein & M. Berger, Weinstein’s Evidence ¶ 706[1], at 706-08 (1990).
The April 22 order is well within the District Court’s discretion, and the petition for mandamus challenging that order is denied. The purported interlocutory appeal from the order is dismissed as moot in view of the challenge to the order on the appeal from the final judgment. On that latter appeal, the order is affirmed.
CONCLUSION
With considerable regret, we hold that the Settlement must be set aside, and we vacate the judgment of the Trial Courts. Our regret arises from two sources: both the extraordinary efforts that have been made by all concerned with this litigation— judges, lawyers, and court-appointed experts—in crafting an ingenious set of arrangements to resolve an extremely difficult set of problems, and the obvious benefits that the result of their combined labors would have brought to most of those with interests in this litigation. But we cannot uphold as “sensible” or “useful” or “fair” or even “achieving the most good for the most people” an impairment of rights accomplished in violation of applicable legal rules.
We need not consider at this time whether any of the changes in claim adjudi *751 cation and payment can yet be made by the settlement of a proper class action or by procedures other than the settlement of a class action, such as a Chapter 11 proceeding for the Trust itself (if it qualifies as a business trust, see 11 U.S.C. § 101(8)(A)(v)), a “reopen[ing of] all aspects of the Plan” (as suggested by the appellants, Joint Brief for Appellants at 50), a consensual modification of the Plan, or, more likely, a second Chapter 11 proceeding for the debtor, see In re Jartran, Inc., 71 B.R. 938 (Bankr.N.D.Ill.1987). Unattractive as the prospect of pursuing other devices may be, we cannot permit the virtues of the present technique to supplant the legal requirements of Rule 23 and the Bankruptcy Code. Those requirements may not be cast aside no matter how beneficial the outcome may seem to the majority of those affected by the class action settlement. A reorganization is assuredly governed by equitable considerations, but that guiding principle is not a license to courts to invent remedies that overstep statutory limitations nor to approve arrangements that some parties to a reorganization proceeding find preferable to the arrangements incorporated in a confirmed and consummated plan. “[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code.” Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 206, 108 S.Ct. 963, 969, 99 L.Ed.2d 169 (1988).
Accordingly, we vacate the judgment of the District Courts and the Bankruptcy Court and remand for further proceedings not inconsistent with this opinion. The petition for mandamus is denied.

. The caption of this Order indicates that it was entered with respect to In re New York City Asbestos Litigation, a group of cases pending in the New York Supreme Court- (in all counties within New York City), and In re Joint Eastern and Southern District Asbestos Litigation, a group of cases pending in the District Courts of the Eastern and Southern Districts of New York.

. This Order was entered in In re Joint Eastern and Southern District Asbestos Litigation and also in In re Johns-Manville Corporation, the Chapter 11 reorganization proceeding pending in the Bankruptcy Court of the Southern District of New York.

. The document is dated June 26, 1991, but appears in the Bankruptcy Reporter under date of June 27, 1991, presumably the filing date. The docket entries reflect an entry date of August 21, 1991.

. As far as we can determine, there is no separate document containing a judgment, see Fed. R.Civ.P. 58, a somewhat surprising omission in a case of this significance and complexity. Apparently the Trial Courts considered the "Conclusion” section of their final opinion, 129 B.R. at 911, to serve as a judgment.

. The health claimants are Class-4 creditors under the Plan, are plaintiffs in federal and state lawsuits pending against the Trust, and are appellants on this appeal. The manufacturers are also Class-4 creditors under the Plan, are defendants (or co-defendants of the Trust) in federal and state lawsuits brought by the health claimants, and are appellants on this appeal.

. The stated percentages were 15 percent of the first $1.3 billion from the liquidation of assets, 40 percent from the next $700 million, and 50 percent from all cash above $2 billion resulting from liquidation.

. We note that Drexel approved a class action settlement readjusting the rights of some creditors against an insolvent entity even though the creditors whose claims were settled in the class action were deemed to be unimpaired creditors, barred from participating in the reorganization proceeding. See Drexel, 960 F.2d at 290. But see Newberg on Class Actions § 20.26 at 631, § 20.30 at 641, § 20.31 at 647 (Cum.Supp., pt. one, Mar. 1992) (recommending use of class action settlements on assumption that class members will have opportunity to vote for acceptance or rejection of settlement as part of reorganization plan).

. This discussion applies equally to MacArthur’s affiliated companies, Western MacArthur Company and Milwaukee Insulation.

. The record reference cited to support this proposition, "Tr. 1/2/91 at 99,” contains no reference to whether any of the class representatives were Level Two claimants. A record reference at the end of the paragraph, "Tr. 1/23/91 at 242,” includes the following colloquy:
Q. Is it fair to say that the time deferral and the risks which you have articulated and Mr. Henderson and Mr. Goldberg have articulated with respect to the payment of Level 2s are in this settlement agreement which was the result of arm’s length good-faith negotiation among competing interests including representatives of Level 2?
Mr. Goldberg: Your Honor, I object to the form. The witness said he didn't know whether the Level 2s were represented.
The Court: I think I sustained that objection. Sustained.

. Subsection 2.02(i) also states that “fair and efficient resolution of claims [is] to be preferred over all else," but the context makes clear that this clause refers to methods of adjudication since it is preceded by the statements that "settlement [is] to be preferred over arbitration" and that "arbitration [is] to be preferred over resort to the tort system."

. The Bankruptcy Court was careful to adjust the proposed modification to make sure that *749 suspension of the operation of the PD Claims Resolution Facility would not impair even the procedural rights of PD claimants. Responding to concern that the absence of administrative staff would deprive PD claimants of responses to their submission of claims, needed to remedy shortcomings in those submissions, the Court required the PD Trust to supply PD claimants with a manual to assist claimants in filing complete and accurate claims, including information on how to avoid most frequently encountered deficiencies. See PD Trust, 920 F.2d at 125.